# IN THE UNITED STATED DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **CRIMINAL ACTION NO.** |
| **v.** ) | **1:17-CR-00313-ELR-AJB** |
| ) | |
| **MARK WINDERS,** ) | |
| ) | |
| **Defendant.** ) | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court is Defendant Mark Winders' motion to suppress all post-arrest statements he made to law enforcement officers, including and especially, statements he made to federal and state law enforcement agents in an interview conducted on June 9, 2017 at the Autry State Prison. [Doc. 37].[1] The Court held an evidentiary hearing, [Doc. 61 (hereinafter "T__")], after which the parties filed post-hearing briefs. [Docs. 65 & 71 ("Government"); Doc. 69 ("Winders")]. For the following reasons, the undersigned **RECOMMENDS** that the motion be **DENIED**.

---

[1] Winders was serving a thirty-year sentence in state prison for kidnaping, armed robbery, criminal attempt to commit murder, and aggravated assault. [Doc. 65, Ex. 1 at 4 & 37]. At the time of the interview, Winders had served two years of his sentence. [*Id.* at 37]. In those two years, Winders was imprisoned at Autry State Prison. [*Id.* at 4].

AO 72A
(Rev.8/82)

## I.     Facts

The relevant facts for resolution of the motion to suppress are as follows.[2]  On June 9, 2017, Deputy U.S. Marshal Donald Hathaway ("Hathaway") and FBI Special Agent Wayne Snyder ("Snyder") (collectively, "Investigators") interviewed Mark Winders ("Winders") at Autry State Prison, T11-12, in connection with a series of telephone fraud cases where the majority of the perpetrators were calling from Autry State Prison.  T6-7.[3]  On the day of the interview, Winders "was brought to the

---

[2]     Currently, Winders has been indicted with the federal crimes of: (1) knowingly using intimidation and threats, with an intent to hinder, delay, and prevent communications to law enforcement officers of the United States regarding information relating to the commission and possible commission of a federal crime, in violation of 18 U.S.C. § 1512(b)(3) (Count One); (2) knowingly causing to be delivered by the Postal Service a written communication addressed to a specific person containing a threat to injure that person or others, in violation of 18 U.S.C. § 876(c) (Count Two); and (3) falsely assuming and pretending to be an employee of the United States, in violation of 18 U.S.C. § 912 (Count Three).  [Doc. 45].  The present motion primarily concerns itself with Count Three of the indictment.  *See* T8-9.

[3]     These perpetrators, some of whom were confirmed to be prisoners, would impersonate U.S. Marshals or other federal employees by calling a victim and telling them that they had been fined for failing to appear to some type of hearing, but could pay off the fine by purchasing a prepaid debit card or gift card, and thereafter report the pertinent numbers of the card over the phone.  T6-9.  During the interview, the Investigators asked Winders to read two numbers aloud.  T52.  The reason for the request is because the suspect left a voicemail on one of the victim's phone stating a phone numbers to return the caller's call.  T52-53.  The Investigators would compare Winders' recitation of the phone numbers with the voicemail the suspect left on the victim's phone.  *See* T52-53.  There was no explanation given to Winders for stating

interview . . . in leg irons and handcuffs . . . accompanied by two to three [] correctional officers." T12.[4]  Pursuant to the Georgia Department of Corrections' policy, which was affirmatively communicated to the Investigators prior to the interview, an inmate cannot refuse to be escorted to the interview room, "but then once the[] [inmate] get[s] there, they can refuse to talk." T12-13.  It is unclear whether Winders knew about this policy, but it was not communicated to him by the Investigators prior to the interview. T36.  The interview took place in the secure part of the prison and was held in a twenty feet by fifteen feet conference room with a maximum person capacity of ten people. T13, 60.  The room had windows, one door, a conference table, and multiple chairs. T13.  The door was shut, but not locked during the interview.  T14.  Winders was sitting with his back to the door.  T14.  The Investigators were not armed.  T14. Winders was relieved of his handcuffs, but the leg irons stayed on.  T34.  He did not know why he was brought in for questioning.  T37.  The interview started at 10:00 a.m.

---

the phone numbers. T53. The Investigators did not have a search warrant to get the voice exemplar. T53. They were under the impression that this was an interview where Winders could have just refused to state the numbers. *See* T53.

[4]     Before the interview, Winders was in administrative segregation (also known as "the Hole." T36. He was placed because of accusations against him that were not described in the record. T36-37. At the time of the interview, he had been in the Hole for two months. T37. Hathaway, however, believed that Winders was brought in from the general population of the prison right before the interview. T38.

and finished by 12:00 p.m. (two hours).  T14-15.  Hathaway was wearing civilian clothing, but Snyder was wearing "tan slacks and a black polo . . . with [a] Georgia Department of Corrections badge on the left side."  T54.

The Investigators revealed to Winders from the onset of the interview why they were interviewing him.  [Doc. 65, Ex. 1 at 8].  Hathaway described the tone of the interview as being conversational for the most part.  T29-30.  The Investigators never physically touched or harmed Winders, nor threatened to harm him.  T29.  At the end of the interview, the Investigators went outside the conference room to summon two correctional officers to escort Winders back.  T32-35.[5]  The record does not disclose if he was taken back to the Hole or to general population.  T32.

The Investigators used many techniques to try to get Winders to admit his involvement in the crimes being investigated, but Winders denied any involvement or knowledge of the crimes.  [Doc. 65, Ex. 1 at 33-35].  The Investigators told Winders that if he didn't "tell [them] what's going on right now," the Investigators would start looking into his family for possible connection to the crimes.  [*Id.* at 13].[6]  Winders was

---

[5] These correctional officers were standing right outside the door of the conference room when the interview ended.  T34.

[6] Hathaway told Winders that if the Investigators go and interview his family, "who's gonna take care of the kids?"  T47; Doc. 65, Ex. 1 at 18.

4

not fazed by these statements, and told the Investigators they can go and ask his family because he's "got nothing to hide." [*Id.* at 13, 17-18]. The Investigators also discussed with Winders the potential charges, along with the potential benefits of cooperation. [*Id.* at 28, 35-37]. They stated that if Winders cooperates it would only help him, not hurt him. T41. The Investigators told Winders that if they had to come back they would not be nearly as gentle to him as they were in the original interview. T41. They told Winders that if he cooperated with them, he would receive state charges, as opposed to federal charges. T40.[7] At a different point in time, the Investigators avowed that if Winders confessed, he would not be charged. T42. The Investigators never promised Winders anything in return for his cooperation. T28-29. During the early stages of the interview, the Investigators stated that if Winders talked they could erase the interview tape and allow him to leave the interview room. T40-41.

At the start of the interview, the Investigators asked Winders if he was "good with talking?" to which Winders responded "[y]eah I guess." T18. Hathaway told Winders that the "interview is voluntary." [Doc. 65, Ex. 1 at 24]. Winders never asked to terminate the interview at any time. T30. Indeed, Hathaway is the one who ended

---

[7] The Investigators told Winders that if he were taken into federal custody he could wind up in any federal prison across the country and might not ever be able to see his children again. T44.

5

the interview. T31. Before and during the interview, Winders was never advised of his *Miranda*[8] rights. T18.

## II.     Contentions of the Parties

Winders contends that he was in custody and entitled to *Miranda* warnings before he was questioned. [Doc. 69 at 8]. Both parties agree that Winders was being interrogated by the Investigators, and was not advised of his *Miranda* rights. [*See* Docs. 37, 65, 69 & 71]. Winders' main contention on the custody issue is that pursuant to the totality of circumstances test on whether a prisoner is in custody laid out in *Howes v. Fields*, 565 U.S. 499 (2012), Winders was in custody, and therefore, needed to be read his *Miranda* rights prior to questioning. [Doc. 69 at 8-15].

Winders also argues that the government obtained his statements involuntarily, in violation of *Jackson v. Denno*, 378 U.S. 368, 376-77 (1984). [Doc. 37 at 2]. In support of this contention, Winders states that the circumstances of the interview were coercive and the interviewers made coercive and deceptive statements. [Doc. 69 at 16-20].

Lastly, Winders asserts that the voice exemplar he gave to the Investigators,

---

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

6

consisting of the two phone numbers he was asked to read aloud, was obtained involuntarily and unknowing. [*Id.* at 22-25]. In support, he argues that the Investigators never gave Winders a reason for their request, [*id.*], nor did they obtain a court order, subpoena or search warrant to give the numbers. [*Id.* at 24]. He also argues that to comply with the Fifth Amendment, the voice exemplar must have only measured the physical properties of Winders' voice and not have been used for testimonial or communicative content but, here, the voice exemplar was being used for testimonial content, in violation of the Fifth Amendment's self-incrimination clause. [*Id.* at 24-25].

In response, the Government argues that Winders was not in custody under *Howes*, 565 U.S. at 512. [Doc. 71 at 1]. It contends that the objective circumstances of the interview do not support the conclusion that Winders was in custody because: (1) Winders was not placed in a coercive setting; and (2) he was free to end the interview at his whim. [*Id.* at 3-5]. Thus, the Government submits, Winders has not met his burden in demonstrating that he was held in custody. [*Id.* at 5]. It further argues that Winders' argument that he was placed in the Hole for two months in anticipation of the interview is unfounded and lacks the requisite evidence to prove such causality. [*Id.*].

AO 72A
(Rev.8/82)

The Government also argues that Winders' statements were given voluntarily. [Doc. 65 at 12]. It claims that the circumstances of the interview were not coercive, [*id.* at 13]: there was no physical violence or punishment used to force Winders to speak, [*id.* at 14]; and Winders' statements were not obtained by any coercive or deceptive government practices, or by any direct or implied promises, [*id.* at 14]. It contends that urging Winders to tell the truth and cooperate is not coercive, [*id.* at 15]; there were no assurances that the statements Winders would give the Investigators would not be used against him, [*id.* at 16]; and the discussion of going after Winders' family was not a threat. [*Id.* at 17]. The Government submits that based on evidence the Investigators possessed, there was a reasonable belief that Winders' family members were also involved in the crimes. [*Id.* at 17-18]. It contends that Winders understood the consequences of speaking to the Investigators and made a deliberate choice to speak with them, [*id.* at 18], particularly considering that Winders is well acquainted with the criminal justice system as demonstrated by his demeanor throughout the interview. [*Id.* at 20-21]. The Government contends that the way he answered the Investigators' questions was very calculated, shedding light on his knowledge of the consequences of confessing. [*Id.* at 21].

AO 72A
(Rev.8/8
2)

### III. *Discussion*

The present case revolves around two issues: (1) was Winders in custody, and therefore required to be read his *Miranda* rights; and (2) were the statements he made to the Investigators given voluntarily and not the product of coercion.

### A. *Custody*

In *Miranda*, 384 U.S. at 444, the Supreme Court held that the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.*[9] Law enforcement officials are required to adhere to *Miranda*'s requirements only when engaged in a "custodial interrogation." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). If a person is not in custody, law enforcement does not have to advise that person of his *Miranda* rights. *See id.*; *Howes*, 565 U.S. at 514 (quotation omitted) ("An inmate who is removed from the general prison population for questioning and is thereafter . . . subjected to treatment in connection with the interrogation that renders him 'in custody'

---

[9] Pursuant to *Miranda*, an uncounseled statement made by a defendant during custodial interrogation should be suppressed from use by the government in its case-in-chief unless the prosecution proves that the suspect voluntarily waived his or her right to counsel and privilege against self-incrimination. 384 U.S. at 444.

for practical purposes . . . will be entitled to the full panoply of protections prescribed by *Miranda*." ).

The defendant "bears the burden of establishing that he was in custody." *United States v. Dix*, No. 3:12-00007-TCB-RGV, 2013 WL 610219, at *3 (N.D. Ga. Jan. 29, 2013) (citation omitted) (R&R), *adopted at* 2013 WL 609458 (N.D. Ga. Feb. 19, 2013); *see United States v. De la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) (holding that "if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.").[10]

Custody is defined for the purposes of *Miranda* as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation omitted). " '[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes*, 565 U.S. at 508-09. The *Howes* court held that there is no *per se* requirement that a defendant who is in prison and is interviewed on unrelated crimes be advised of his *Miranda* rights since he might not be in custody pursuant to *Miranda*.

---

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

*See Howes*, 565 U.S. at 504-05 & 512 ("[A] term of imprisonment, without more, is not enough to constitute *Miranda* custody."). In deciding whether a prisoner is in custody for *Miranda* purposes, the Court "focus[es] on all of the features of the interrogation." *Id.* at 514. "[W]hether an interview in prison is custodial depends on a variety of factors, including duration [of the questioning], statements made during the interview, the presence of physical restraints during questioning, and the release of the interviewee at the end of the questioning." *Id.* at 509 (internal citations omitted).

All of the *Howes* factors point towards a finding that Winders was not in custody. Although Winders did not request the interview, the duration of the interview was not too long in that it lasted two hours. T14-15; *see United States v. Muegge*, 225 F.3d 1267, 1269-71 (11th Cir. 2000) (holding that an "interview lasting approximately two and one half hours" was non-custodial). The Investigators never physically touched or harmed Winders, nor threatened to physically harm him. T29. The Investigators were not armed and were the only ones in the interview room with Winders while the correctional officers waited outside with the door closed. T14; *see Muegge*, 225 F.3d at 1271 ("[Defendant] was questioned in a secure facility, but that does not necessarily make the interrogation custodial."). The leg irons stayed on, but the handcuffs were removed. T34; *see Dix*, 2013 WL 610219, at *4 (finding defendant

11

was not in custody when officers handcuffed defendant, and escorted defendant outside where he was immediately un-handcuffed and then interviewed by two agents). The interview was not heated and was very conversational. T29-30; *see United States v. Oddo*, 133 Fed. Appx. 632, 635 (11th Cir. May 19, 2005) (holding that defendant was not in custody in part because the atmosphere of the interrogation was "non-confrontational"). At no point throughout the interview did Winders state that he wanted to terminate the interview. T30; *see United States v. Phillips*, 812 F.2d 1355, 1362 (11th Cir. 1987) (concluding that defendant was not in custody when he "never requested . . . to terminate the interview"). It is unclear whether Winders was brought to the interview room from the Hole or the general population of the prison, T38, but even if Winders was taken to the interview room from an isolated part of the prison, this alone would not tilt the scale enough for the Court to find that he was in custody. *See Howes*, 565 U.S. at 508 ("[A] prisoner is [not necessarily] in custody for purposes of *Miranda* whenever a prisoner is isolated from the general prison population and questioned about conduct outside the prison."). Winders was never read his *Miranda* rights, T59, but it was not legally required since Winders was not being exposed to custodial interrogation. *See Mathiason*, 429 U.S. at 494.

12

### B.   *Voluntariness*

"Regardless of whether [the defendant] was in custody or not, the government must prove that his statements were voluntary." *United States v. Blocker*, No. 1:14-cr-228-AT-AJB, 2016 WL 3281018, at *18 (N.D. Ga. Feb. 29, 2016) (citing *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010)) (R&R), *adopted at* 2016 WL 3259096 (N.D. Ga. June 14, 2016).  "While the failure to comply with *Miranda* creates a presumption that a confession was not voluntary, an examination of the totality of the circumstances is necessary to determine whether the confession was actually voluntarily given."   *Lall*, 607 F.3d at 1285 (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)).  "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'" *United States v. Villaverde-Leyva*, No. 10-035-RWS-AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010) (quoting *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989)) (R&R), *adopted at* 2011 WL 121932 (N.D. Ga. Jan. 14, 2011).  "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226

13

(1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996)). "However, while the Eleventh Circuit has 'enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . .'" *Id.* (citing *Gonzalez*, 71 F.3d at 828).

"Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 156, 163 n.1 (1986); *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988); *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984)). "Isolated incidents of police deception and discussions of realistic penalties for cooperative and non-cooperative defendants are normally insufficient to preclude free choice." *Id.* (internal citations omitted). "A prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Howes*, 565 U.S. at 512 (citation omitted). "Any interview of one suspected of a crime by a[n] [] officer will have coercive aspects to it, simply by virtue of the fact that the [] officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495.

14

"The threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize is neither mitigated nor magnified by the location of the conduct about which questions are asked[,]" so interrogating someone within prison walls does not add to the Court's voluntariness calculus. *See Howes*, 565 U.S. at 514 (quotation omitted). "However, courts have recognized that non-custodial interviews are not nearly as 'inherently coercive' as those that take place while a suspect is in custody." *Blocker*, 2016 WL 3281018, at *19 (quoting *Schneckloth*, 412 U.S. at 247; *Miranda*, 384 U.S. at 477-78).

The present case dealt with a non-custodial interview. Winders voluntarily spoke with the Investigators without any indicia of coercion.[11] The length of questioning was

---

[11] Winders contends that there is a sub-issue within the voluntariness inquiry on whether the voice exemplar he gave the Investigators was given voluntarily and whether it will be used for communicative aspects, both in violation of the Fifth Amendment. "[O]btaining the voice exemplar[] solely for the purpose of identification" does not impinge upon any constitutional right. *United States v. Barnes*, 807 F. Supp. 2d 1154, 1187 (N.D. Ga. 2010); *see United States v. Shaw*, 555 F.2d 1295, 1300 (5th Cir. 1977) (citations omitted) ("the taking of a voice exemplar impinges upon no right protected by either the Fourth, Fifth or Sixth Amendments to the Constitution."). "[Not] every compulsion of an accused to use his voice or write compels a communication within the cover of the [Fifth Amendment] privilege." *Gilbert v. California*, 388 U.S. 263, 266 (1967). Requesting Winders to read the numbers out loud is equivalent to a lineup where officers are trying to match up the facial features of the suspect on the day of the crime to the person standing in the lineup. *See United States v. Wade*, 388 U.S. 218, 222-23 (1967) ("[C]ompelling [the defendant] to speak within hearing distance of the witnesses, even to utter words

not too elongated in that it lasted two hours. *See United States v. Cobb*, No. 1:16-cr-281-TCB-RGV, 2017 U.S. Dist. LEXIS 119724, at *38-39 (N.D. Ga. June 1, 2017) (finding that an hour-and-half interrogation did not qualify as coercion) (R&R), *adopted at* 2017 WL 3225063 (N.D. Ga. July 28, 2017).  Aside from one heated moment, the nature of the interrogation was conversational. T29-30.  Winders was never physically touched, harmed, nor threatened in any way. T29.  The Investigators discussed with Winders realistic glimpses of his future if he cooperated with them versus if he did not cooperate with them. T40-41.  They discussed the potential charges of the crime and the benefits of assisting them. T40-41.  The Investigators never promised Winders anything in return for his cooperation. T28-29.  The part of the interrogation where the Investigators told Winders that they will investigate his family if he does not confess, is an isolated incident of police coercive tactics. *See Villaverde-Leyva*, 2010 WL 5579825, at *11 (citations omitted); *Cobb*, 2017 U.S. Dist. LEXIS 119724, at *48 (quotations omitted) ("[C]ourts have been reluctant to deem trickery by the police a basis for excluding a confession on the

---

purportedly uttered by the robber, was not compulsion to utter statements of a testimonial nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt.").  The voice exemplar given by Winders is considered in conjunction with the rest of the voluntariness analysis pursuant to the test laid out in *Howes*.

ground that the tricks made the confession coerced and thus involuntary."). Winders never asked to terminate the interview. T30. Hathaway asked Winders if he was "good with talking?" [Doc. 65, Ex. 1 at 2]. Even though the Investigators did not read Winders his *Miranda* rights which would constitute *prima facie* evidence of a voluntary interrogation, the circumstances of the interview demonstrate that the Investigators did not coerce Winders into making the statements. Winders made the statements voluntarily.

### III.  Conclusion

For all of the above and foregoing reasons, the undersigned **RECOMMENDS** that Winders' motion to suppress his statements, [Doc. 37], be **DENIED**.

The Court has now recommended a ruling on all matters referred, and has not been advised of any further impediments to the scheduling of a trial. Therefore, this matter is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the 17th day of September, 2018.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A (Rev.8/82)